## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CHERI ASSOUMI,                    :
                                  :
            Plaintiff             :       No. 3:15-CV-0244
                                  :
      vs.                         :       (Judge Nealon)
                                  :
CAROLYN W. COLVIN, Acting         :
Commissioner of Social Security,  :
                                  :
            Defendant             :

FILED
SCRANTON

MAR 2 4 2016

PER _____ DEPUTY CLERK

## MEMORANDUM

On February 3, 2015, Plaintiff, Cheri Assoumi, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2]  under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. §

1381 et seq, respectively.  (Doc. 1).  The parties have fully briefed the appeal.  For

the reasons set forth below, the decision of the Commissioner denying Plaintiff's

application for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on November 21, 2011, alleging disability beginning on January 31, 2011, due arthritis, Raynaud's Disease, brain damage, knee problems, osteoarthritis, Rheumatoid Arthritis, possible seizures, migraine headaches, injuries from two car accidents, spinal stenosis, severe degenerative disc disease, neck problems, carpal tunnel syndrom, hip problems, and sciatic nerve damage.  (Tr. 10, 41, 232).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on March 20, 2012.  (Tr. 10).  On April 26, 2012, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 10).  An oral hearing was held on August 1, 2013, before administrative law judge Sharon Zanotto, ("ALJ"), at which Plaintiff and an impartial vocational expert, Michael Kibler, ("VE"), testified.  (Tr. 10, 24).  On September 27, 2013, the ALJ issued a decision denying

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 15, 2015.  (Doc. 12).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing a full range of light work with limitations. (Tr. 10-23).

On October 17, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 5). On January 13, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on February 3, 2015. (Doc. 1). On April 15, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 11 and 12). Plaintiff filed a brief in support of her complaint on June 10, 2015. (Doc. 17). Defendant filed a brief in opposition on July 13, 2015. (Doc. 18). Plaintiff filed a reply brief on July 15, 2015. (Doc. 19).

Plaintiff was born in the United States on July 15, 1963, and at all times relevant to this matter was considered an "individual closely approaching advanced age."[6] (Tr. 228). Plaintiff obtained her GED, and can communicate in English. (Tr. 231, 233). Her employment records indicate that she previously worked as a laborer and a supervisor. (Tr. 263-269). The records of the SSA

---

6. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

reveal that Plaintiff had earnings in the years 1979 through 2011. (Tr. 213). Her annual earnings range from a low of two thousand eighty-four dollars and seventy-one cents ($2,284.71) in 1979 to a high of twenty-five thousand four hundred forty-five dollars and thirteen cents ($25,445.13) in 1990. (Tr. 213). Her total earnings during those thirty-two (32) years were five hundred sixty-one thousand seventy-six dollars and ninety-five cents ($561,076.95). (Tr. 213).

In a document entitled "Function Report - Adult" filed with the SSA in January 2012, a document which is largely illegible due to faint print, Plaintiff indicated that she lived in a house with her family. (Tr. 250). Plaintiff did not take care of anyone other people or pets. (Tr. 251). She indicated that she took care of her personal needs, prepared her own meals daily, did "some cleaning" and the laundry with help from "aides," drove unaccompanied, and shopped for groceries and personal items. (Tr. 251-253). Before her illnesses, injuries, or conditions began, she was able to work two (2) to three (3) jobs and clean her house without any problems. (Tr. 229). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff checked all categories. (Tr. 255). She used a walker and cane to ambulate, noting that both were prescribed by a doctor "years ago." (Tr. 256). She also noted that she was unable to take medicine because they caused migraines. (Tr. 257).

4

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take medicine, or attend appointments. (Tr. 252, 254). She had difficulty counting change, paying bills, handling a savings account and using a checkbook. (Tr. 254). She could not pay attention for long, finish what she started, or follow either written or spoken instructions. (Tr. 255). She did not hand stress or changes in routine well. (Tr. 256).

Socially, Plaintiff did not spend time with others, had no hobbies, went nowhere on a daily basis, and no longer watched television because she could not take the "sound and color." (Tr. 254). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 234). She stated that she needed "peace and quiet" and that she could not handle people all talking at once because it would make her head hurt and cause "electrical signals." (Tr. 255).

Plaintiff also filled out a Supplemental Function Questionnaire for pain. (Tr. 258). She noted that her pain began in the 1970s after an auto accident, and described her constant pain as a "bad toothache in [her] legs," with constant popping in and out that caused an inability to sit down because it traveled from the back of her neck downward to her feet. (Tr. 258). She stated that all activities caused her pain, as did sleeping. (Tr. 258). She did not take any medication for

5

her pain, but hot showers sometimes "work[ed]." (Tr. 259).

At her hearing on August 1, 2013, Plaintiff testified that she was alleging she was disabled due to a motor vehicle accident that resulted in degenerative disc disease in her cervical and lumbar spine, a left knee replacement, a right knee arthroplasty, a right shoulder impairment, and a cognitive disorder. (Tr. 29). Plaintiff testified that she drove herself to the hearing, accompanied by her father, and that she drove probably two (2) miles a week to and from the grocery store and would get lost while driving. (Tr. 32-34, 56).  She lived with her father and husband in a one-floor house. (Tr. 34). She and her husband moved in with her father after the accident because her husband was a long-haul truck driver and did not want Plaintiff alone while he was gone due to her cognitive issues that caused her to do things like forgetting to turn the stove off. (Tr. 54-55). She had no friends, engaged in no activities, did not volunteer or belong to any organizations, and did not go to church. (Tr. 76-77).

Plaintiff stood for the majority of the time she testified at her hearing because sitting was "the worst" for her and caused her hips to "pop out of their sockets," pain to run up her spine, her right underarm to swell up and hurt, and"trouble with [her] hand." (Tr. 51). At home, Plaintiff would alternate between lying down and standing as a result of this problem with sitting. (Tr. 52).

Plaintiff also testified that she had memory problems and was confused easily, especially with numbers, as she could not recall her own date of birth or the last four (4) digits of her Social Security number, would get lost driving even to her own house, and would not remember where she parked or what car she arrived in when leaving a store. (Tr. 52-53, 57, 59). Shopping in stores and lights caused her to become very confused. (Tr. 57). She was able to start her laundry, but would forget things like putting in the detergent in or turning on the water. (Tr. 53). She left her last job at Amazon because she was having memory problems that caused her to make mistakes. (Tr. 42). Plaintiff testified that in order to be able to concentrate, she had to be completely alone because when she was around people she had "to concentrate hard" and "didn't get them right" as they would ask her a question and look at her "weird" when she answered. (Tr. 58, 76). She stated that in order for her to be able to cook at home, no one could be even in the next room. (Tr. 58).

Plaintiff also testified that light was a problem as it caused confusion and triggered migraines. (Tr. 57-59, 73). For example, shopping was too overwhelming because of the lighting which confused, "mess[ed] up [her] brain," and caused migraines (Tr. 57, 77-79). The same held true for using computers due to the light. (Tr. 59). She kept the room dark when at home due to this light

sensitivity issue. (Tr. 59). She wore sunglasses when it was necessary to be in any type of light. (Tr. 73-74). Dust, fumes, odors, gases, chemicals and weather also caused her to have migraines. (Tr. 74). She experienced migraines every day and usually had one upon waking up, and if not up waking up, one would be triggered "as soon as something [went] wrong." (Tr. 79-80). She would lie down to treat her migraines, and did not take medication because she would get rebound migraines. (Tr. 80). However, she had tried "a whole list of medications" for her migraines. (Tr. 80).

In terms of physical impairments, Plaintiff testified that the heaviest object from a grocery store that she could lift is a bottle of olive oil. (Tr. 69). She had difficulty walking on concrete, using steps, crouching, kneeling, stooping, and turning her head left and right because it caused pain in her collarbone. (Tr. 70-73).

## **MEDICAL RECORDS**

By way of background, on November 20, 2010, Plaintiff presented to the emergency room after being involved in a motor vehicle accident. (Tr. 340). Plaintiff was sent home with Percocet for pain, and Plaintiff was advised to apply ice to her shoulders, chest, and knee. (Tr. 341).

On November 23, 2010, Plaintiff returned to the emergency room

8

due to complaints of back and neck pain. (Tr. 328). It was noted that she was "ambulatory and had no limitations." (Tr. 328).

### A. Physical Impairment Treating Records

#### 1. Joseph DeMario, D.O.

Plaintiff attended numerous appointments through March of 2011 with Dr. DeMario, her primary care physician. (Tr. 423). Plaintiff reported experiencing pain in her hand, right clavicle, neck, low back, right knee, and right ankle. (Tr. 417-19, 421, 423). Diagnostic tests were ordered by Dr. DeMario, including: (1) An MRI of Plaintiff's cervical spine which showed a bone bruise secondary to trauma at C5-C6, a disc osteophyte at C5-C6 causing mild central spinal canal narrowing, moderate neural foraminal, narrowing at C5-C6, and disc bulges at C4-C5 and T3-T4; (2) An MRI of Plaintiff's lumbar spine showing multilevel degenerative changes with mild to moderate central canal stenosis at L2-L3, L3-L4, L4-L5 similar to Plaintiff's MRI from 2006, degenerative changes, and significant neural foraminal narrowing at multiple levels, severe on the left at L5-S1; and (3) X-rays of Plaintiff's right collarbone which revealed no fracture, but that Plaintiff had osteolysis and widening of the AC joint. (Tr. 306-309, 397). As a result of these diagnostic imaging findings, Dr. DeMario referred Plaintiff to physical therapy. (Tr. 366-67).

9

In April 2012, Plaintiff returned to Dr. DeMario due to joint pain and headaches. (Tr. 488). Plaintiff's exam revealed an intact memory, and normal mood, affect, judgment and insight. (Tr. 489-490). Dr. DeMario opined that Plaintiff had findings indicative of fibromyalgia, and recommended that she see a rheumatologist and attend more physical therapy. (Tr. 490).

### 2.   Joe Buletza, P.T.

Plaintiff attended nine (9) physical therapy sessions with Joe Buletza, P.T. (Tr. 373-76, 392). P.T. Buletza reported, after the fourth session, that Plaintiff should avoid bending and lifting and could not perform even sedentary work for the time period of December 27, 2010 through January 31, 2011. (Tr. 370). At Plaintiff's sixth session, P.T. Buletza told Plaintiff that her treatment was "on the right track" and improvement was noted in Plaintiff's neck and low back pain. (Tr. 375). Despite Plaintiff's self-reported continued improvement, she did ended her physical therapy after her ninth session. (Tr. 376, 392).

### 3.   Craig Fultz, M.D.

In January 2011, Plaintiff presented to Dr. Fultz, an orthopedic surgeon, for evaluation of right knee pain. (Tr. 415). Plaintiff's examination revealed she was oriented, alert, and could answer questions quickly and appropriately. (Tr. 414). Her right knee was tender, but there was not effusion,

redness, warmth, edema, or infection present. (Tr. 414). After x-rays revealed no evidence of fracture or disturbance to Plaintiff's prior knee replacement surgeries that took place in 2007 for her right knee and 2008 for her left knee, Dr. Fultz ordered a bone scan. (Tr. 317, 414). This scan revealed post-operative changes only. (Tr. 317, 410).

In early February 2011, Plaintiff had another appointment with Dr. Fultz due to complaints of right knee and shoulder pain. (Tr. 412). Dr. Fultz found Plaintiff's right knee did not show signs of infection, warmth, redness, effusion, or edema, and an exam revealed that she had only mild diffuse tenderness of her right knee with an excellent range of motion. (Tr. 411). Dr. Fultz did not find any structural abnormalities in Plaintiff's right knee and concluded that Plaintiff sustained a contusion and soft tissue pain in the motor vehicle accident. (Tr. 410). With regards to Plaintiff's complaints of tenderness in her collarbone and scapula, Dr. Fultz noted that x-rays of Plaintiff's right collarbone taken in January 2011 showed a fibrous nonunion with a gap between the two (2) bone ends, but normal alignment and no acute fracture. (Tr. 410). Furthermore, an impingement test and Hawkins test were negative, Plaintiff was able to reach the center of her back and top of her head, and she was noted as having good muscle strength and no instability. (Tr. 411). Dr. Fultz diagnosed Plaintiff with a fracture in her shoulder

that failed to heal despite surgical intervention, and recommended that Plaintiff avoid heavy, repetitive lifting, pulling, or tugging and that she perform stretching exercises. (Tr. 409-410). Dr. Fultz opined that Plaintiff's knee and shoulder pain would be "self-limiting" and anticipated the pain would resolve within about three (3) months. (Tr. 409-410).

At the end of February 2011, Plaintiff had a follow-up appointment with Dr. Fultz. (Tr. 408). Plaintiff reported that she had knee pain, but denied that she was experiencing locking, instability, or catching. Her exam revealed that she had slight warmth in her knees, but no effusion, and that she had increased and excellent range of motion in comparison to her prior visit. (Tr. 408). It was noted that Plaintiff was ambulating without an assistive device, and was doing a home workout program. (Tr. 408). 408). Once again, Dr. Fultz found no structural or mechanical problems in Plaintiff's knees. (Tr. 407).

### 4.   Shanon Holcomb, D.C.

In July 2012, Plaintiff attended twelve (12) chiropractic sessions with Dr. Holcomb over a one (1) month period for pain in her head, neck, back, and sciatica. (Tr. 527-529, 536). At that time, Plaintiff was unemployed because she was "currently taking care of her elderly father." (Tr. 536). Dr. Holcomb recommended spinal manipulation, low volt stimulation, moist heat, and massage

12

therapy.  (Tr. 537).

**B.    Mental Health Impairment Treatment Records**

      **1.    Henry Wehman, M.D.**

On January 2012, Plaintiff had an appointment with Henry Wehman, M.D.
(Tr. 549).  Plaintiff noted that she had been experiencing migraines, and was
wearing sunglasses as a result.  (Tr. 549).  It was noted that she was anxious, but
she had intact speech, thought content, stream of thought, and cognitive functions.
(Tr. 549).  Dr. Wehman diagnosed Plaintiff with dementia due to head trauma and
post-traumatic stress disorder.  (Tr. 549, 552).  Dr. Wehman advised Plaintiff to
continue with therapy, did not prescribe any medication, and instructed Plaintiff to
return for a follow-up in twelve (12) weeks.  (Tr. 549).

In January 2013, one (1) year later, Plaintiff returned for an appointment
with Dr. Wehman with complaints of anxiety, panic attacks, flashbacks, memory
problems, an inability to spell or write correctly, and concentration difficulty.  (Tr.
550).  It was noted that Plaintiff suffered from severe migraines, but did not take
any medication.  (Tr. 550).  Plaintiff's exam revealed that: her attire and
personal hygiene were unremarkable; her speech was overprotective, but relevant,
coherent, and goal-directed; her affect was somewhat intense and her mood
anxious; her stream of thought and content of thought were normal except for her

reported phobia of motor vehicles.  (Tr. 551).  Dr. Wehman opined that Plaintiff's cognitive functions were impaired by her memory, word-finding difficulty, and poor executive functioning, and instructed Plaintiff to continue therapy and return to see him in four (4) weeks. (Tr. 551-552).

In April 2013, Plaintiff returned for a follow-up visit with Dr. Wehman. (Tr. 552, 554).   It was noted that Plaintiff: had pressured but productive speech; was agitated and anxious; and had normal thought content, stream of thought, and cognitive/executive functions. (Tr. 552).   Dr. Wehman diagnosed Plaintiff with dementia due to head trauma.  (Tr. 554).   Dr. Wehman indicated that Plaintiff had extreme limitations in and understanding in; remembering and carrying out short, simple instructions; making judgments on simple-work related decisions; and relating and responding appropriately to the public, supervisors, coworkers, work pressures, and changes in a routine work setting.  (Tr. 520-521).  He opined that she had no useful ability to perform any of the identified mental work-related activities.  (Tr. 520-22).  When asked what medical/clinical findings supported this assessment, Dr. Wehman wrote only "presentation."  (Tr. 520-22).

C.   **Consultative Examinations**

1.   **Thomas McLaughlin, M.D.**

In February 2012, Plaintiff underwent a consultative examination performed

14

by Thomas McLaughlin, M.D. (Tr. 463). This exam revealed that Plaintiff: was able to follow instructions and understand normal speech; had good knowledge of her remote and recent medical history; walked with a slow, steady, and broad-based gait; stood and rose from a seated position unassisted; was able to get on and off the examination table, but with some groaning while changing positions; had no tenderness or muscle spasms in her cervical spine; had no tenderness, swelling, redness, or warmth in her shoulders, elbows, wrists, or hands; was able to open a jar, button and unbutton her clothing, and pick up coins; had no tenderness, redness, warmth, swelling, effusion, laxity, crepitus or clicks in her knees; had a normal curvature in her lumbar spine with no evidence of muscle spasms; had no muscle weakness or atrophy in her legs; had normal muscle strength, sensation, and deep tendon reflexes in her knees, biceps, and triceps; was alert and oriented; engaged in appropriate conversation; answered questions appropriately; followed direction; and had a normal affect. (Tr. 465-468). Dr. McLaughlin opined that Plaintiff could: (1) frequently lift and/or carry up to twenty (20) pounds; (2) occasionally lift and/or carry up to twenty-five (25) pounds; (3) stand and walk for six (6) hours or more in an eight (8) hour workday; (4) sit for eight (8) hours with a sit/stand option; (5) occasionally bend, kneel, stoop, and crouch; and (6) never balance or climb. (Tr. 471-472). Plaintiff also

needed to avoid heights. (Tr. 472).

### 2. __Stanley Schneider, Ed. D.__

In March 2012, Plaintiff underwent a psychological consultative examination performed by Stanley Schneider, Ed.D. (Tr. 478). Plaintiff discussed her memory problems with Dr. Schneider, and it was noted that Plaintiff incorrectly stated her age, did not know what the date was, and got lost while driving to her appointment despite calling several times for directions. (Tr. 478-479). Plaintiff also noted that the fluorescent lighting made her head hurt. (Tr. 480, 482). Dr. Schneider stated that Plaintiff had difficulty tolerating the examination. (Tr. 482). On mental status examination, it was noted that: Plaintiff's eye contact varied; she was "mildly" anxious and agitated; she stated that if two (2) people talked at the same time, it felt "like electricity in [her] head;" she had a fast stream of thought; she was "obsessed" with her impairments and ailments; she could not identify similarities between objects or simple proverbs; she declined to perform serial fives; she lost her train of thought throughout the assessment; and she wore sunglasses due to the light which caused confusion and migraines. (Tr. 481-484). Dr. Schneider opined that Plaintiff had: "poor" orientation; gross difficulty with attention and concentration; marked to extreme limitations in understanding, remembering, and carrying out short, simple

instructions and making judgments on simple work-related decisions; a marked

limitation in responding appropriately to the public; and an extreme limitation in

responding improperly to work pressures and changes in a routine work setting .

(Tr. 484-486).  Dr. Schneider diagnosed Plaintiff with Cognitive Disorder NOS,

secondary to multiple medical conditions, and assigned Plaintiff a Global

Assessment of Functioning ("GAF") of fifty (50).  (Tr. 484).

> **D.**    **State Agency Psychologist Evaluation**
>
> > **1.**    **Michael Suminski, M.D.**

On March 20, 2012, Michael Suminski, Ph. D., reviewed the evidence of

record and noted that the hospital records following Plaintiff's car accident did not

establish evidence of "brain damage."  (Tr. 99).  Dr. Suminski also reviewed the

findings of Dr. Schneider, and noted that Plaintiff could recall information about

her past job, details of the motor vehicle accident, and past marriages.  (Tr. 99).

He also noted that Plaintiff drove herself to the consultative examination.  (Tr. 99).

He observed that Plaintiff prefers to be alone, but is appropriate socially when

interacting with others such as medical staff.  (Tr. 104).  In reviewing Dr.

Schneider's opinion, Dr. Suminski explained:

> Given that the claimant was able to provide a lot of
> information to the panelist and given that she was able to drive
> to the [consultative examination], it is thought that she did not

> put forth her best effort when asked to do simple cognitive problems like digits forward. There is no medical evidence in file to document a brain injury of significance. The [medical source opinion] in file is inconsistent with the claimant's performance in providing a variety of information to the panelist. Her [activities of daily living] show that she can prepare simple meals. As stated above, she can drive a car. Her husband is obviously comfortable with her driving. . . . She can do some housework. She can go out alone and shop. She may have some problems managing money and seeks her husband's help with this function. She states that she cannot follow written or spoken instructions but this is not supported by medical evidence.

(Tr. 99). Ultimately, Dr. Suminski opined that Plaintiff could perform work that involves simple one and two-step instructions. (Tr. 104).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being

19

supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

21

disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

22

requirements of the Social Security Act through the date last insured of December 31, 2015. (Tr. 12). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of January 31, 2011. (Tr. 12).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "degenerative disc disease of the cervical spine, lumbar spine, and thoracic spines, status post knee surgery, bilaterally (residual effects), status post ORIF surgery- right clavicle fracture with non-union, status post carpal tunnel syndrome release surgery (residual effects), migraine headaches/ headaches, obesity, organic mental disorder, post-traumatic stress disorder, and dementia (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926).  (Tr. 13).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full

range of light work with limitations.  (Tr. 15).  Specifically, the ALJ stated the

following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform the full range of
> light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except that she would need to alternate between sitting and
> standing at will.  She would be limited to occasional crouching,
> kneeling, stooping, climbing ramps and stairs.  She cannot
> climb any ladders, rope, and scaffold.  She must avoid
> concentrated exposure to dust, fumes, odors, gases, and
> chemicals.  She must avoid concentrated exposure to cold and
> humidity.  She must avoid very loud and loud noises and bright
> sunlight.  She would probably need to work indoors or in an
> area where it is shaded.  She needs to avoid bright lights
> indoors and might need to wear sunglasses for indoor work.
> She is limited to jobs with a GED of 1, 2, or 3. She requires a
> job with repetitive, short cycle tasks, occasional decision
> making, occasional work setting work changes, and no
> production rate or pace work.  She is limited to occasional
> interaction only with supervisors, coworkers or the public such
> that she can work around them but can only have occasional
> interaction with them.

(Tr. 15-16).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the her age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

24

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 21-22).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between January 31, 2011, the alleged onset

date, and the date of the ALJ's decision. (Tr. 23).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in

failing to properly analyze the opinion evidence; and (2) the ALJ erred in failing

to find Plaintiff and her father fully credible. (Doc. 17, pp. 14-24). Defendant

disputes these contentions. (Doc. 18, pp. 16-26).

### 1.    Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's

evaluation of the opinion evidence. (Doc. 12, pp. 16-20). More specifically,

Plaintiff argues that the ALJ erred in assigning significant weight to the opinion of

Dr. Suminiski, the state agency physician, and limited weight to the opinions of

Plaintiff's treating physicians, Dr. Wehman and Dr. Fultz, and the consultative

examiner, Dr. Schneider because: (1) Dr. Suminski's opinion was not supported

by or consistent with the objective medical evidence; and (2) Dr. Suminski did not

have the entire medical record to review in arriving at his conclusions regarding

Plaintiff's limitations, namely Dr. Wehman's opinion. (Doc. 17, pp. 16-22).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of the entire record); Chandler v. Commissioner of Social Security, 667 F.3d 356, 361 (3d Cir. 2011) ("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records . . . '[t]he law is clear . . . that the opinion of a treating physician does not bing the ALJ on the issue of functional capacity' . . . state agent opinions merit significant considerations as well.") (citing Brown v. Astrue, 649, F.3d 193, 197 n.2 (3d Cir. 2011)); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded significant weight to Dr. Suminski, the state agency physician, in reaching the RFC determination because the state agency examination record indicates that the whole medical record was not

available for review by Dr. Suminski being that Dr. Wehman rendered his opinion regarding Plaintiff's limitations in April 2013, after Dr. Suminski issued his own medical opinion in March 2012. (Tr.99, 520-522). Therefore, Dr. Suminski's medical opinion did not involve a review of Plaintiff's entire mental health medical record, and thus was not well-supported. In fact, in response to the question, "[a]re there medical source and/ or other source opinions about the individual's limitations or restrictions which are more restrictive than your findings," Dr. Suminski responded, "No." (Tr. 105). As discussed, in order for the ALJ to properly give any weight to a medical opinion, the entire medical record must have been available for and reviewed by the non-examining, non-treating physician. See Sassone, 165 F. App'x 954, 961 (3d Cir. 2006). However, as noted, the entire medical record was not available to the non-examining, non-treating physician, Dr. Suminski, whose opinion was afforded significant weight by the ALJ.

Therefore, because the opinion of the state agency physician was not well-supported by the entire record as it did not include a review of the opinion of Dr. Wehman rendered in April 2013, substantial evidence does not support the RFC determination. As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

28

## **CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: March 24, 2016

/s/ **William J. Nealon**
**United States District Judge**